RECEIPT #_1_7_ Case 1:06-cv-11625-NMG Document 1 Filed 09/12/06 Page 1 of 41
AMOUNT $__50.00
SUMMONS ISSUED_Y
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK _Kanas
DATE 9/12/2006

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SHEILA SIMON, Derivatively on Behalf of
NOVELL, INC.,

Plaintiff,

v.

JACK L. MESSMAN, RONALD W. HOVSEPIAN,
ALBERT AIELLO, JR., FRED CORRADO,
RICHARD L. CRANDALL, CLAUDINE B.
MALONE, RICHARD L. NOLAN, THOMAS G.
PLASKETT, JOHN W. PODUSKA, SR., PH.D.,
JAMES D. ROBINSON, III, KATHY BRITTAIN
WHITE, JAMES R. TOLONEN, GLENN RICART,
RONALD E. HEINZ, JR., RICHARD A. NORTZ,
DAVID R. BRADFORD, JENNIFER KONECNY-
COSTA, DARCY G. MOTT, DENICE Y. GIBSON,
CHRISTOPHER M. STONE, JOHN F. SLITZ, JR.,
STEWART G. NELSON, ERIC E. SCHMIDT,
DENNIS R. RANEY, CARL S. LEDBETTER, H.
CARVEL MOORE, GERARD VAN KEMMEL,
JOSEPH A. LASALA, JR., and JOSEPH S.
TIBBETTS, JR.,

Defendants,

and

NOVELL, INC.,

Nominal Defendant.

CIVIL ACTION NO.

06 CA 11625 NMG

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

MAGISTRATE JUDGE _____

Plaintiff, by and through her attorneys, derivatively on behalf of Novell, Inc. ("Novell" or
the "Company"), alleges upon personal knowledge as to herself and her own acts, and upon
information and belief as to all other matters, based upon, *inter alia,* the investigation conducted
by and through her attorneys, which included, among other things, a review of Securities and
Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available
documents regarding Novell as follows:

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Nominal Defendant Novell against certain of its directors and officers: Jack L. Messman, Ronald W. Hovsepian, Albert Aiello, Jr., Fred Corrado, Richard L. Crandall, Claudine B. Malone, Richard L. Nolan, Thomas G. Plaskett, John W. Poduska, Sr., Ph.D., James D. Robinson, III, Kathy Brittain White, James R. Tolonen, Glenn Ricart, Ronald E. Heinz, Jr., Richard A. Nortz, David R. Bradford, Jennifer Konecny-Costa, Darcy G. Mott, Denice Y. Gibson, Christopher M. Stone, John F. Slitz, Jr., Stewart G. Nelson, Eric E. Schmidt, Dennis R. Raney, Carl S. Ledbetter, H. Carvel Moore, Gerard Van Kemmel, Joseph A. LaSala, Jr., and Joseph S. Tibbetts, Jr. (collectively, "Defendants"), by Plaintiff Shelia Simon, who is now, and at all times relevant has been, a shareholder of Novell.

2.     Plaintiff, derivatively on behalf of Novell, seeks relief for the damages sustained, and to be sustained by Novell, as a result of Defendants' violations of state and federal law, including their breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), which occurred between January 1, 1997 and the present (the "Relevant Period").

3.     Defendant Jack L. Messman, a member of the Novell Board of Directors and, until recently, the Company's President and Chief Executive Officer ("CEO"), Defendant Ronald W. Hovsepian, a member of the Novell Board of Directors and currently the Company's President and CEO, and certain past and present officers, have engaged in certain transactions, including the exercise of back-dated options, to reap millions of dollars in unlawful windfall profits at the expense of the Company.

4.     A stock option granted to an employee of a corporation allows the employee to purchase company stock at a specified price – referred to as the "exercise price" – for a specified period of time. Stock options are granted as part of employees' compensation packages to create incentives for them to boost profitability and stock value. When an employee exercises an option, he or she purchases the stock from the company at the exercise price, regardless of the stock's price at the time the option is exercised.

5.     The unlawful conduct occurred while Defendants were directing the Company. These Defendants authorized or failed to halt the back-dating of options in dereliction of their fiduciary duties to the Company as officers and directors, thus causing or allowing the Company to suffer millions of dollars in harm.

6.     Pursuant to the Company's stock option plans, options are required to be priced at the price of the Company stock on the day of the grant. If an option is back-dated to a day on which a market price was lower than the price on the day the option is granted, then the employee pays less and the company gets less money for the stock when the option is exercised. Furthermore, the purchaser of the option gets a greater compensation than that to which he or she is entitled.

7.     From January 1, 1997 to the present, Defendants authorized, modified, or failed to halt the back-dating of stock option grants to certain officers of the Company.

8.     As a result of these back-dated option grants, these officers were unjustly enriched to the detriment of the Company and its shareholders. Back-dating the options also breached Defendants' fiduciary duties of care, loyalty, and good faith to the Company.

9.     Furthermore, the backdating of these stock options brought an instant paper gain to these Novell executives because the options were priced below the stock's fair market value

3

when they were actually awarded. Under GAAP, this instant paper gain was equivalent to paying extra compensation and was thus a cost to Novell. These costs were also not properly recorded. In turn, since these costs were not properly recorded, Novell's profits were overstated and ultimately may result in a restatement of Novell's past financial results for several fiscal years.

10.     In addition to breaches of fiduciary duty and accounting issues, the backdating of stock options can have extremely serious income tax consequences. While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment. Accordingly, backdated stock options are disqualified from that favorable tax break, and Novell therefore owes millions of dollars in income taxes.

11.     In a recent article published by *The Wall Street Journal*, Arthur Levitt, a former chairman of the SEC was quoted as stating that stock option backdating "*represents the ultimate in greed.*" Further, Levitt stated, "*It is stealing, in effect. It is ripping off shareholders in an unconscionable way.*"

12.     On May 5, 2006, President George W. Bush stated in an interview on the Kudlow & Company show airing on CNBC that "overcompensating or trying to backdate things is bad for America, and there ought to be consequences when people don't tell the truth and are not transparent."

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise in part under the Constitution and the laws of the United States. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). Additionally, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.

4

14. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§ 1391(a)(1) and 1401 because one or more of Defendants either resides or maintains executives offices in this Judicial District, a substantial portion the acts and transactions constituting the violations of law alleged in this Complaint occurred in substantial part in this Judicial District, and the Company could have brought the action in this District against Defendants. Moreover, Defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## THE PARTIES

### The Plaintiff

16. Plaintiff Shelia Simon has owned at all times relevant to this action, and continues to own, Novell common stock. Ms. Simon is a New Jersey resident.

17. As a current holder of Novell common stock and a holder during the period of the wrongs alleged herein, and pursuant to Fed. R. Civ. P. 23.1, Plaintiff Simon has standing to assert these claims on behalf of the Company and will fairly and adequately protect the interests of the Company and its other stockholders.

### The Nominal Defendant

18. Nominal Defendant Novell is incorporated in the state of Delaware and maintains its executive offices at 404 Wyman Street, Suite 500, Waltham, Massachusetts 02451. The Company engages in the design, development, maintenance, implementation, and support of open source software for use in business solutions. It provides security and identity management, resource management, desktop, workgroup, and data center solutions on various operating

5

systems, including Linux, NetWare, Windows, and Unix. Founded in 1983, the Company offers identity-driven computing solutions that help customers with their identity management, resource management, and security issues; and Linux and platform services solutions that offer open cross-platform approach to networking and collaboration services, including file, print, messaging, scheduling, and workspace. Novell stock trades on the NASDAQ under the ticker symbol "NOVL."

## The Director Defendants

19.     The following parties, sometimes referred to herein as the "Director Defendants," during the Relevant Period, served as members of the Board of Directors of Novell as follows:

### Jack L. Messman

20.     Director Defendant Jack L. Messman has served as a director of the Company since 1985, and was Chairman of the Novell Board of Directors from November 2001 to June 21, 2006, until he was replaced by Mr. Plaskett. Mr. Messman is the sole member of the Novell's Option Grant Committee. He became President and CEO of Novell in connection with Novell's acquisition of Cambridge Technology Partners (Massachusetts), Inc., an eBusiness systems integration company, in July 2001, until he was removed from the Company on June 21, 2006 and replaced by Mr. Hovsepian. Mr. Messman served as President from July 2001 through October 2005, at which time Mr. Hovsepian was named President. Mr. Messman's tenure as a director on the Novell Board will conclude on October 31, 2006. Mr. Messman is also a director of RadioShack Corporation, Safeguard Scientifics, Inc. and Timminco Limited. Upon information and belief, Mr. Messman is a Massachusetts resident.

### Ronald W. Hovsepian

21.     Director Defendant Ronald W. Hovsepian has served as a director of the Company since June 21, 2006, and currently serves as Novell's President and CEO, replacing

6

Defendant Messman as President in July 2001, and as CEO on June 21, 2006. Mr. Hovsepian joined Novell in June 2003 as President of North America, and has also serves as the Company's COO. He is non-executive Chairman of the Board of Directors of the Ann Taylor Corporation. Upon information and belief, Mr. Hovsepian is a Massachusetts resident.

Albert Aiello, Jr.

22.    Director Defendant Albert Aiello, Jr., has served as a director of the Company since 2003, and is a member of Novell's Audit Committee. He is Managing Director of Albert Aiello & Associates, a strategic technology management consulting company he founded in February 2003. Upon information and belief, Mr. Aiello is a Massachusetts resident.

Fred Corrado

23.    Director Defendant Fred Corrado has served as a director of the Company since 2002, and is Chairperson of Novell's Audit Committee. Mr. Corrado served as Vice Chairman of the Board of Directors and Chief Financial Officer of The Great Atlantic & Pacific Tea Company, Inc., a food retailer, from October 1992 until February 2002. He is also a director of two non-profit organizations, Covenant House and the New Jersey Performing Arts Center. Upon information and belief, Mr. Corrado is a Florida resident.

Richard L. Crandall

24.    Director Defendant Richard L. Crandall has served as a director of the Company since 2003, and is a member of Novell's Audit Committee.   Mr. Crandall is a founding Managing Director of Arbor Partners, a high technology venture capital firm, a position he has held since November 1997. He also serves as the chairman of the Enterprise Software Roundtable, an organization of the senior corporate leadership of the 35 largest software companies, which he founded in July 1994. Mr. Crandall is also a director of Diebold, Inc., and

7

the Dreman/Claymore Dividend & Income Fund, a management investment company. Upon information and belief, Mr. Crandall is a Colorado resident.

## Claudine B. Malone

25.     Director Defendant Claudine B. Malone has served as a director of the Company since 2003, and is a member of Novell's Audit and Compensation Committees. Ms. Malone has been the President and CEO of Financial and Management Consulting Inc., a consulting firm, since 1984. She also serves on the boards of Hasbro, Inc., Aviva Life Insurance Company, Science Applications International Corp., and LaFarge North America. Upon information and belief, Ms. Malone is a Virginia resident.

## Richard L. Nolan

26.     Director Defendant Richard L. Nolan has served as a director of the Company since 1998, and is a member of Novell's Compensation Committee. Mr. Nolan is the William Barclay Harding Professor of Management of Technology, emeritus, Harvard Business School, an institution of higher education, a professorship he was awarded in September 1991. He is also the Philip M. Condit Professor of Business Administration at the University of Washington since September 2003. Mr. Nolan is also a director of The Great Atlantic & Pacific Tea Company. Upon information and belief, Mr. Nolan is a Massachusetts resident.

## Thomas G. Plaskett

27.     Director Defendant Thomas G. Plaskett has served as a director of the Company since 2002, and was recently appointed the Novell Board's Non-Executive Chairman on June 21, 2006. Mr. Plaskett is Chairman of Novell's Corporate Governance Committee and a member of Novell's Compensation Committee. He has served as Chairman of Fox Run Capital Associates, a private merchant banking and consulting firm focusing on advisory and consulting services for

8

emerging companies, from October 1991 to the present. Mr. Plaskett is also a director of Alcon, Inc. and RadioShack Corporation. Upon information and belief, Mr. Plaskett is a Texas resident.

John W. Poduska, Sr., Ph.D

28.    Director Defendant John W. Poduska, Sr., Ph.D has served as a director of the Company since 2001, and is Chairman of Novell's Compensation Committee and a member of Novell's Corporate Governance Committee. Dr. Poduska was the Chairman of Advanced Visual Systems, Inc., a provider of visualization software, from January 1992 to December 2001. He is also a director of Anadarko Petroleum Corporation and Safeguard Scientifics, Inc.    Upon information and belief, Dr. Poduska is a Massachusetts resident.

James D. Robinson, III

29.    Director Defendant James D. Robinson, III has served as a director of the Company since 2001.   Mr. Robinson is co-founder and General Partner of RRE Ventures and Chairman of RRE Investors, LLC, private information technology venture investment firms, and has held those positions since 1994.   He is non-executive chairman of Bristol-Myers Squibb Company, and a director of The Coca-Cola Company and First Data Corporation.    Upon information and belief, Mr. Robinson is a New York resident.

Kathy Brittain White

30.    Director Defendant Kathy Brittain White has served as a director of the Company since 2003, and is a member of Novell's Corporate Governance Committee. Ms. White has served as President and Founder of Rural Sourcing, Inc., an organization aimed at developing information technology employment in rural communities, since January 2004. Ms. White also serves as President of the Horizon Institute of Technology, a foundation supporting technology outreach initiatives in the Arkansas delta, since founding it in 2002. She is also a director of Mattel, Inc. Upon information and belief, Ms. White is a New York resident.

9

**The Option Defendants**

31.     The following parties, sometimes referred to herein as the "Option Defendants," who, in addition to Director Defendants Messman and Hovsepian, have stock option grants implicated in the back-dating investigation as follows:

James R. Tolonen

32.     Option Defendant James R. Tolonen is former Senior Vice President and CFO of the Company, until he resigned on March 12, 1998.  Mr. Tolonen was issued stock option grants during the Relevant Period. Upon information and belief, Mr. Tolonen is a California resident.

Glenn Ricart

33.     Option Defendant Glenn Ricart is Chief Technology Officer of the Company since February 16, 1996.  Dr. Ricart was issued stock option grants during the Relevant Period. Upon information and belief, Mr. Ricart is a Utah resident.

Ronald E. Heinz, Jr.

34.     Option Defendant Ronald E. Heinz, Jr. is Novell's Senior Vice President of Worldwide Sales since January 1997.  Mr. Heinz was issued stock option grants during the Relevant Period. Upon information and belief, Mr. Heinz is a Utah resident.

Richard A. Nortz

35.     Option Defendant Richard A. Nortz is Novell's Senior Vice President of Customer Services since February 1997.  Mr. Nortz was issued stock option grants during the Relevant Period.  Upon information and belief, Mr. Nortz is a Florida resident.

David R. Bradford

36.     Option Defendant David R. Bradford is former Senior Vice President, General Counsel and Corporate Secretary of the Company, until July 2000.  Mr. Bradford was issued stock option grants during the Relevant Period.  Mr. Bradford is a California resident.

10

Jennifer Konecny-Costa

37.     Option Defendant Jennifer Konecny-Costa is Novell's Senior Vice President of
Human Resources, since July 18, 1996. Ms. Konecny-Costa was issued stock option grants
during the Relevant Period. Upon information and belief, Ms. Konecny-Costa is a California
resident.

Darcy G. Mott

38.     Option Defendant Darcy G. Mott is former Vice President and Treasurer of the
Company.     Mr. Mott was issued stock option grants during the Relevant Period.     Upon
information and belief, Mr. Mott is a Utah resident.

Denice Y. Gibson

39.     Option Defendant Denice Y. Gibson is former Senior Vice President and General
Manager of the Distributed Networks Business Unit of the Company. Ms. Gibson was issued
stock option grants during the Relevant Period. Upon information and belief, Ms. Gibson is a
Colorado resident.

Christopher M. Stone

40.     Option Defendant Christopher M. Stone is former Senior Vice President of
Strategic Business Development of the Company, from September 1997 until he resigned in
September 1999. Mr. Stone was issued stock option grants during the Relevant Period. Upon
information and belief, Mr. Stone is a Massachusetts resident.

John F. Slitz, Jr.

41.     Option Defendant John F. Slitz, Jr. is former Senior Vice President of Marketing
of the Company from August 1997 until he resigned in August 31, 1999. Mr. Slitz was issued

11

stock option grants during the Relevant Period. Upon information and belief, Mr. Slitz is a Nevada (and/or Colorado) resident.

Stewart G. Nelson

42. Option Defendant Stewart G. Nelson is former Executive Vice President and Chief Operations Officer of the Company. Mr. Nelson was issued stock option grants during the Relevant Period. Upon information and belief, Mr. Nelson is a Utah resident.

Eric E. Schmidt

43. Option Defendant Eric E. Schmidt is former Chairman and CEO of the Company from 1997 to 2001. Dr. Schmidt was issued stock option grants during the Relevant Period. Upon information and belief, Mr. Schmidt is a California resident.

Dennis R. Raney

44. Option Defendant Dennis R. Raney is former Senior Vice President, Chief Accounting Officer, and CFO of the Company from June 2, 1998 until July 16, 2001. Mr. Raney was issued stock option grants during the Relevant Period. Upon information and belief, Mr. Raney is a California resident.

Carl S. Ledbetter

45. Option Defendant Carl S. Ledbetter is Novell's former Senior Vice President of Engineering, Research and Development and Chief Technology Officer. Dr. Ledbetter was issued stock option grants during the Relevant Period. Upon information and belief, Mr. Ledbetter is a California resident.

H. Carvel Moore

46. Option Defendant H. Carvel Moore is former President of Novell Americas from July 2001 to July 2003. Mr. Moore was issued stock option grants during the Relevant Period. Upon information and belief, Mr. Moore is a Washington resident.

12

Gerard Van Kemmel

47.     Option Defendant Gerard Van Kemmel is the Company's Chairman and former President of Novell Europe, Middles East and Africa. Mr. Van Kemmel was issued stock option grants during the Relevant Period. Upon information and belief, Mr. Van Kemmel resides in France.

Joseph A. Lasala, Jr.

48.     Option Defendant Joseph A. Lasala, Jr. is Senior Vice President, General Counsel and Corporate Secretary of the Company. Mr. Lasala was issued stock option grants during the Relevant Period. Upon information and belief, Mr. Lasala is a Massachusetts resident.

Joseph S. Tibbetts, Jr.

49.     Option Defendant Joseph S. Tibbetts, Jr. was CFO of the Company, until June 21, 2006. Mr. Tibbetts was issued stock option grants during the Relevant Period. Upon information and belief, Mr. Tibbetts is a Massachusetts resident.

## OBLIGATIONS AND DUTIES OF DEFENDANTS

50.     By reason of their positions as directors, officers and/or fiduciaries of Novell and because of their ability to control the business, corporate and financial affairs of Novell, each of the Defendants owed Novell the duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed duties of loyalty and candor, including full disclosure of all material facts related thereto. Further, Defendants owed a duty to Novell to ensure that Novell operated in compliance with all applicable federal and state laws, rules, and regulations; and that Novell not engage in any unsafe, unsound, or illegal business practices. The conduct of Defendants complained of herein involves knowing violations of their duties as directors of Novell, and the

13

absence of good faith on their part which Defendants were aware or should have been aware posed a risk of serious injury to Novell.

51.   To discharge these duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Novell.  By virtue of this obligation of ordinary care and diligence, Defendants were required, among other things, to:

> (a)   manage, conduct, supervise, and direct the employees, businesses and affairs of Novell, in accordance with laws, rules and regulations, and the charter and by-laws of Novell;
>
> (b)   neither violate nor knowingly or recklessly permit any officer, director or employee of Novell to violate applicable laws, rules and regulations and to exercise reasonable control and supervision over such officers and employees; ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Novell;
>
> (c)   remain informed as to how Novell was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice, including, but not limited to, maintaining and implementing an adequate system of financial controls to gather and report information internally, to allow Defendants to perform their oversight function properly to prevent the use of non-public corporate information for personal profit;

14

(d)    supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by Novell and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of Novell and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above; and

(e)    preserve and enhance Novell's reputation as befits a public corporation and to maintain public trust and confidence in Novell's as a prudently managed institution fully capable of meeting its duties and obligations.

52.    Defendants breached their duties of care, loyalty, candor and good faith by allowing Defendants to cause or by themselves causing the Company to misrepresent its financial results, as detailed herein, and by failing to prevent Defendants from taking such illegal actions. In addition, because of these illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action lawsuits that allege violations of federal securities laws. As a result, Novell has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)    Costs incurred in investigating and defending Novell and certain directors and officers in the class action lawsuits, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

53.    Moreover, these actions have irreparably damages Novell's corporate image and goodwill. For at least the foreseeable future, Novell will suffer from what is known as the "liar's

15

discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Novell's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## THE NOVELL BOARD OF DIRECTORS

54.     Director Defendants, by their fiduciary duties of care, good faith and loyalty, owed to Novell a duty to insure that the Company's financial reporting fairly presented, in all material aspects, the operations and financial condition of Novell. In order to adequately carry out these duties, it is necessary for Director Defendants to know and understand the material, non-public information to be disclosed or omitted from the Company's public statements. This material, non-public information included the fact that Novell's internal controls were woefully defective and that the Company's executives were improperly backdating their stock options.

55.     **Committees of the Board**.   The standing committees of the Novell Board include: (i) the Audit Committee; (ii) the Compensation Committee; (iii) the Corporate Governance Committee; (iv) the Information Technology Oversight Committee; and (v) the Option Grant Committee.

56.     *Audit Committee*.   Director Defendants Corrado, Aiello, Crandall and Malone have been members of the Audit Committee during the Relevant Period. Mr. Corrado has served as Chairman of the Audit Committee during the Relevant Period. The Novell Board of Directors determined that three of the members of the Audit Committee, Mr. Corrado, Mr. Crandall, and Ms. Malone, possess the attributes to be considered financially sophisticated for purposes of the listing standards of The NASDAQ Stock Market and have the background to be considered "audit committee financial experts" as defined by the rules and regulations of the SEC.

57.     As members of the Audit Committee, Director Defendants Corrado, Aiello, Crandall and Malone had a special duty to know and understand this material information

16

regarding the stock option grants as set out in the Audit Committee's charter, which provides that the "function of the Audit Committee is oversight." In particular, the Audit Committee's purpose is to: (1) to assist the Board in its oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the Company's Internal Controls and (iv) the performance of the Company's internal audit function; (2) to interact directly with and evaluate the performance of the independent auditors, including to determine whether to engage or dismiss the independent auditors, to pre-approve their compensation, and to monitor the independent auditors' qualifications and independence; and (3) to prepare the report required by the rules of the SEC to be included in the Company's proxy statement.

58. The members of the Audit Committee knew or should have known that Novell's financial statements were false and thereby permitted or condoned the unlawful practices described herein. Accordingly, Director Defendants Director Defendants Corrado, Aiello, Crandall and Malone, through their improper execution of their duties and responsibilities as members of the Novell Audit Committee, knew of or recklessly disregarded the rampant unlawful practices at Novell described herein.

59. *Compensation Committee*. Director Defendants Plaskett, Poduska, and White have been members of the Compensation Committee during the Relevant Period. Mr. Plaskett has served as Chairman of the Compensation Committee during the Relevant Period.

60. As members of the Compensation Committee, Director Defendants Plaskett, Poduska, and White were responsible for administering the issuance of option grants under the Company's stock option plans. In particular, the purpose of the Novell Compensation Committee, according to its charter, is to: (1) to review, consider, and suggest compensatory

17

plans and pay levels for the CEO for approval by the independent members of the Board, and to review, consider, and suggest and approve compensatory plans and pay levels for all other officers of the Company subject to the reporting requirements of Section 16 of the Exchange Act and all executives who are direct reports to the CEO; (2) to recommend the annual retainer and meeting attendance fees for all non-employee directors of the Company for service on the Board and its committees to the Corporate Governance Committee; (3) to review and administer (in conjunction with management) the employee long- and short-term compensation plans, employee performance-based incentive plans (which are cash and equity based) and other employee benefit plans in alignment with the Company's business strategy and in a manner that reflects, in general, programs and practices within the high technology industry; and (4) to issue annually a report on executive compensation in accordance with the applicable rules and regulations of the SEC for inclusion in the Company's proxy statement.

61.     Accordingly, the members of Novell's Compensation Committee are responsible for administering the issuance of option grants under the Company's Stock Option Plans. Therefore, Director Defendants Plaskett, Poduska, and White were responsible to review the stock options grants to Novell executives. These Director Defendants did not fulfill this duty, therefore causing or allowing the Company's executives to obtain unreasonable and unreported compensation via the backdating of stock option grants.

62.     ***Option Grant Committee.*** Director Defendant Messman was the sole member of the Option Grant Committee during the Relevant Period. Director

63.     As a member of the Option Grant Committee, Mr. Messman was responsible for making grants of stock options and restricted stock to non-executive employees eligible to

18

participate in Novell's employee equity plans to allow for efficient response to hiring and other personnel needs.

0.     Accordingly, as the sole member of Novell's Option Grant Committee, Director Defendant Messman is responsible for administering the issuance of option grants under the Company's Stock Option Plans. Therefore, Mr. Messman was responsible to review the stock options grants to Novell executives. He did not fulfill this duty, therefore causing or allowing the Company's executives to obtain unreasonable and unreported compensation via the backdating of stock option grants.

0.     The improper dating of these stock options, in turn, caused a misstatement of Novell's earning because the compensation costs in connection with the misdated options were not properly recorded in violation of GAAP.

0.     Director Defendants Corrado, Aiello, Crandall, Malone, Plaskett, Poduska, White and Messman, as directors of Novell and members of its Board Committees, had ample opportunity to discuss this material information with Option Defendants at any Board meetings that occurred during the Relevant Period, as well as at meeting of committees of the Board.

0.     Despite these duties, Director Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Novell to the investing public and the Company's shareholders during the Relevant Period.

0.     Instead of properly disclosing these improper stock option backdating practices and the corresponding understatement of compensation costs, Director Defendants caused or allowed these practices to continue unabated throughout the Relevant Period.

19

## SUBSTANTIVE ALLEGATIONS

0.     Plaintiff, derivatively on behalf of Novell, seeks relief for the damages sustained,

and to be sustained by Novell, as a result of Defendants' violations of state and federal law,

including their breaches of fiduciary duties, abuse of control, gross mismanagement, waste of

corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, which

occurred during the Relevant Period.

0.     Defendants are liable for their individual and collective breaches of their fiduciary

duties of loyalty, good faith, candor, and due care in connection with, *inter alia*, the following:

      (a)    Option Defendants' intentional manipulation of their stock option grants by changing the dates on which they actually were granted to dates on which the stock was trading at a lower price, in order to get a lower "strike price" at which the options could be exercised, for the purpose of generating bigger profits upon the exercise of the options;

      (b)    Option Defendants' intentional misreporting of stock option grant exercise dates by reporting an exercise date on which the stock was trading at a lower price than on the date on which the option actually was exercised, which has the effect of reducing the taxable income of the employees, but exposes the Company to tax penalties for failure to pay withholding taxes;

      (c)    Option Defendants' self-dealing, including the improper manipulation of options and other misconduct, resulting in higher costs and other financial harm to Company;

      (d)    Director Defendants' approval, based on the recommendation of certain of its Committees, of stock option grants, with improper practices for the dating of the grants, or which could be manipulated to increase stock option grant proceeds or other compensation under the plans;

      (e)    Defendants' failure to discover and/or prevent the improper manipulation of employee stock option grants and employees' wrongdoing by the Option Defendants;

      (f)    Defendants' failure to discover and/or prevent the public misreporting of earnings caused by the manipulation of employee stock options, including its effect on stock option grant expenses and tax liabilities;

      (g)    Defendants' failure to properly implement, oversee and maintain adequate accounting and internal controls, practices and procedures;

20

(h) Defendants' failure to ensure that Novell operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements;

(i) Defendants' failure to ensure that Novell not engage in any unsafe, unsound, or illegal business practices;

(j) Defendants' failure to discover and/or prevent circumstances that could cause harm to the reputation and business of Novell; and

(k) Defendants' failure to discover and/or prevent the exposure of the Company and its executives to civil and criminal liabilities.

71. As a result of the back-dating and other manipulation of options issued to the Option Defendants, they have been unjustly enriched in the amount of hundreds of millions of dollars at the expense of the Company. The Company receives less money from the Option Defendants when they exercise their options at prices substantially lower than they would have if the options had not been back-dated.

72. The practice of back-dating stock options not only lined the pockets of the Option Defendants at the direct expense of the Company, but also resulted in the overstatement of the Company's profits during that time. This is because options priced below the stock's fair market value when they were awarded brought the recipient an instant paper gain that must be accounted for as additional compensation and treated as an expense to the Company. The Company must account for the options at a lower price, and may have to restate its results to reflect the previously unreported expenses for several fiscal years.

73. The practice of back-dating options has caused the Company to suffer additional adverse consequences, including (i) exposure to the cost of defending against and potential liability for regulatory actions and private securities class actions; and (ii) substantial losses to Novell and other damages, such as to its reputation and goodwill.

21

74.     During the Relevant Period, upon information and belief, Novell issued the

following back-dated stock option grants:

(a)     On July 18, 1997, the Company granted 1,463,560 options to Option
        Defendants Tolonen, Ricart, Heinz, Nortz, Bradford, Konecny-Costa,
        Mott, and Gibson at $6.91 per share. In a little more than one month after
        the grant, by August 26, 1997, the Company's stock price had climbed
        *44.14%* to $9.96.

(b)     On February 9, 1998, the Company granted 300,000 options to Option
        Defendants Stone, Slitz, and Nelson at $7.63 per share. But, the closing
        price of the Company's stock on February 9, 1998 was actually $7.97 per
        share. The option price was based on the February 6, 1998 closing price.
        In less than one month after the grant, by March 4, 1998, the Company's
        stock price had climbed *45.7%* to $11.12.

(c)     On March 17, 1999, the Company granted 1,725,000 options to Option
        Defendants Schmidt, Raney, Heinz, Nelson, Nortz, Slitz, and Stone at
        $24.06 per share. But, the closing price of the Company's stock on March
        17, 1999 was actually $26.00 per share. The option price was based on the
        March 16, 1999 closing price. In less than one week after the grant, by
        March 22, 1999, the Company's stock price had climbed *13.3%* to $27.25.

(d)     On November 12, 1999, the Company granted 500,000 options to Option
        Defendant Schmidt at $18.44 per share. But, the closing price of the
        Company's stock on November 12, 1999 was actually $18.69 per share.
        The option price was based on the November 11, 1999 closing price. In
        less than two weeks after the grant, by November 22, 1999, the
        Company's stock price had climbed *28.5%* to $23.69.

(e)     On April 17, 2001, the Company granted 15,000 options to Director
        Defendant Messman at $4.00 per share. But, the closing price of the
        Company's stock on April 17, 2001 was actually $4.24 per share. The
        option price was based on the April 16, 2001 closing price. In less than
        one month after the grant, by May 8, 2001, the Company's stock price had
        climbed *37.3%* to $5.49.

(f)     On November 12, 2001, the Company granted 500,000 options to Option
        Defendants Ledbetter, Moore, and Van Kemmel at $3.93 per share. In
        less than one month after the grant, by December 5, 2001, the Company's
        stock price had climbed *28.8%* to $5.06.

(g)     On August 12, 2002, the Company granted 1,500 options to Option
        Defendant Ledbetter at $1.82 per share. In less than two weeks after the

22

grant, by August 26, 2002, the Company's stock price had climbed *57.1%* to $2.86.

(h) On December 15, 2003, the Company granted 1,542,500 options to Director Defendants Messman and Hovsepian, as well as Option Defendants LaSala, Tibbetts, and Van Kemmel at $9.42 per share. Continuously, for almost two months, the stock price climbed, and by February 3, 2004, the Company's stock price had jumped *49.3%* to $14.06.

75. The aforementioned grants raise "backdating flags," as they were granted on lows in the Company's stock price that came right before significant stock price run ups.

76. On May 19, 2006, *The Wall Street Journal* published an analysis of stock options granted to chief executive officers of half a dozen companies in an article titled, "U.S. INTENSIFIES STOCK-OPTIONS PROBE: Subpoenas by Prosecutors in Manhattan Office Signal Major Step-up in scrutiny." The subject matter of this article, and several others in previous and subsequent days, was the illegal backdating of stock option grants to senior executives at the expense of public companies like Novell and its shareholders.

77. On June 22, 2006, the Company's Board of Directors announced that it had removed Mr. Messman as Novell's CEO, effective June 21, 2006, and replaced him with Mr. Hovsepian, already the Company's President and Chief Operating Officer, though Mr. Messman will remain on Novell's Board of Directors through October 31, 2006. Additionally, on June 21, 2006, the Board of Directors fixed the size of the Novell Board at eleven and elected Mr. Hovsepian to fill the vacancy. Mr. Plaskett, a director of Novell since November 2002, was elected non-executive Chairman of the Novell Board of Directors.

78. Also, it was revealed that Joseph S. Tibbetts, Jr., the Company's CFO, would "leave Novell's employment." Dana C. Russell, Novell's current Vice President of Finance and

Corporate Controller, was appointed interim CFO, while the Company conducts a search for a permanent replacement.

79.     Then, after the market closed on August 29, 2006, as a result of the aforementioned back-dated option grants, Novell announced that it "began a self-initiated, voluntary review of the company's historical stock-based compensation practices and related potential accounting impact." Novell claimed that it had initiated the review of "historical stock-based compensation practices and the related potential accounting impact in light of news about the stock option practices of numerous companies across several industries."

80.     Based on preliminary findings, the Audit Committee of Novell's Board of Directors engaged independent outside legal counsel to conduct the review. The Company also indicated that the review may result in the need to restate past financial results, including those pertaining to its most recent quarter.

81.     Also, in light of the review, the Company announced that it would not able to file on time its quarterly report for third quarter fiscal year 2006 with the SEC. Novell confirmed this delay on September 11, 2006, the SEC deadline for filing. This failure exposes the Company to the risk that it will be delisted from NASDAQ for failing to file its requisite financial statements.

82.     Defendants' conduct has unjustly enriched Novell's top executives to the detriment of Novell and its shareholders.

83.     Upon information and belief, between 1997 and 2003, the Company, through the actions of the Board and its Compensation Committee, granted stock options for the purchase of millions of shares of the Company's common stock along with certain other perks to the Option Defendants.

84. Contrary to the Company's public disclosures, as shown by the pattern of grant dates that were highly favorable to the Option Defendants, the stock options were not, in fact, priced on the date of the grant, but were, in fact, back-dated in complete disregard of the stock price on the actual grant date.

85. The Compensation Committee, together with the Option Grant Committee, was responsible for overseeing the details of the Company's compensation, employee benefit and stock option plans. The Compensation and Option Grant Committees were also responsible for negotiating and administering the Company's employment arrangement with the Option Defendants, supervising incentive compensation programs for the Company's employees, and reviewing and monitoring director compensation programs.

86. In its public filings with the SEC, the Company represented that the exercise price of all of the stock options under its Stock Option Plans would be no less than the fair market value of the Company's common stock, measured by the publicly traded closing price for the Company stock, on the date of the grant.

87. Defendants violated their fiduciary duties to the Company by failing to act with due care, loyalty and good faith, when they either expressly authorized the practice of back-dating options, or in conscious abrogation of their fiduciary duties, permitted it to occur.

88. Defendants misrepresented and caused the Company to misrepresent in public SEC filings that the stock options were priced at no less than the fair market value of the stock on the date of the grant, thereby affirmatively concealing the claims set forth herein. The stock option plans, referenced above, were published each in the Company's Definitive Proxy Statements and incorporated by reference each year in the Company's Annual Reports on Form 10-K. Also, the executives' compensation, including their stock option grants, was disclosed in

these yearly proxy statements. Defendants' misrepresentations about their stock option pricing practices were known to be false or were made in reckless disregard of its truth or falsity, and the concealment could not have been discovered through reasonable diligence by the typical shareholder, prior to August 29, 2006 announcement.

89.     The unlawful conduct occurred while Director Defendants were directing the Company. These Director Defendants authorized, modified, or failed to halt back-dating of options in dereliction of their fiduciary duties to the Company as directors, thus causing or allowing the Company to suffer hundreds of millions of dollars in harm.

90.     The backdating of stock options can also have severe tax consequences. While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment. In effect, backdating allows these "in-the-money" options to appear in regulatory filings as if they were ordinary grants. For example, for performance-based stock options (generally granted to the five highest-paid executives), a company is allowed to take a tax deduction on that full amount *provided that the options were granted at the market price*. Backdating, however, automatically disqualifies those options from receiving the tax break— instead, a company's tax deduction would be capped at $1 million for each of the top five executives. As a consequence, the Company may have underpaid its income taxes and overstated its net income for each of the relevant fiscal years. Defendants' failure to disclose accurately the stock option grant dates violated Sections 162 and 422 of the Internal Revenue Code.

91.     In light of these serious potential tax-related ramifications, the IRS is now examining as many as 40 companies being investigated for backdating stock options to determine whether they owe millions of dollars in unpaid taxes. On July 28, 2006, *The New*

50

*York Times* published an article entitled "I.R.S. Reviewing Companies in Options Inquiries,"

which stated:

> The Internal Revenue Service is examining as many as 40 companies ensnared in various stock options investigations to determine whether they owe millions of dollars in unpaid taxes.
>
> In the last few weeks, the agency has directed its corporate auditors to start reviewing the tax returns of dozens of executives and companies, which may have improperly reported stock option grants. These preliminary investigations are expected to take months, but if there is early evidence of widespread tax trouble, I.R.S. officials said they were prepared to step up their effort.
>
> "Where there are indications of mischief, we want to now look at those cases and see if they complied with tax laws," said Bruce Ungar, the agency's deputy commissioner for large and midsize businesses. "It is possible that they are compliant, but the early indication is that there is a good likelihood there is some noncompliance.
>
> "If this is a big problem, we will apply more resources," he added.
>
> The I.R.S. auditors are focusing on the potential tax obligations from backdated stock options that have been cashed out since 2002. Federal rules bar the I.R.S. from opening cases that are more than three years old. Still, tax lawyers estimate the agency could reap hundreds of millions of dollars from civil penalties, unpaid taxes and interest payments if widespread wrongdoing is found.
>
> The agency appears to be taking aim both at companies that took improper tax deductions, and at executives who received favorable tax treatment and might have misreported income.
>
> So far, rank-and-file employees who simply received potentially backdated stock options are not in the agency's cross hairs.
>
> "If you were involved in the mischief, you would want to be worried," Mr. Ungar said. "If you weren't involved in it, then you are not in the same situation."
>
> The tax scrutiny is the latest twist in what is perhaps the biggest financial scandal of the year and comes as the agency cracks down on misreported executive pay. The I.R.S. follows several other federal agencies that have begun investigations into the myriad problems that arise from improperly reported or backdated stock option grants.
>
> The Securities and Exchange Commission has said it is examining 80 companies for potential accounting and disclosure problems. On Wednesday, it

underlined that focus with new rules on reporting executive compensation. The Justice Department has issued subpoenas to at least 35 companies and last week brought its first criminal charges, against two former executives of Brocade Communications. Now, tax troubles may be next.

By itself, backdating stock option grants is not necessarily illegal. But it can have severe tax consequences separate from potential accounting violations. While ordinary stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not. Backdating effectively allows such in-the-money options to appear in regulatory filings as if they were ordinary grants.

The I.R.S. is broadly focused on two main areas that may have been abused: performance-based stock options for top executives and incentive stock options that were frequently handed out to the rank and file. Each receives a different type of tax treatment.

Performance-based stock options are generally granted to the five highest-paid executives and can often be worth tens, if not hundreds of millions of dollars when they are cashed out. So long as the options meet certain standards, such as being granted at the market price, companies are allowed to take a tax deduction on that full amount.

But backdating — effectively granting stock options with a discount — automatically disqualifies those options from receiving the tax break. Instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

"If these companies have been deducting huge option grants that they actually couldn't deduct, that seems like a big pile of money out there," said Larry R. Langdon, a tax lawyer in Palo Alto, Calif., and a former I.R.S. commissioner.

Improperly awarded incentive stock options could lead to even more tax trouble. Backdating, which grants a discounted option, effectively voids the favorable tax treatment that incentive stock options provide employees, rendering their individual tax returns inaccurate. Companies, meanwhile, could be faulted for underreporting their payroll tax.

"Maybe it is not a widespread problem, but if this happened to five employees, you have five nightmares," said Fred Whittlesey, an executive pay consultant and head of the Compensation Venture Group. "Employees will have a legal and companies will have an ethical responsibility to insulate them from what happened based on actions of a few people."

The I.R.S. assembled a five-member task force to oversee its examinations about two months ago. And in the last few weeks, the Internal Revenue

commissioner, Mark W. Everson, directed the agency's corporate auditors to look into potential tax issues as dozens of companies have come forward. In a statement, he called on them to "consult closely with the S.E.C. to determine which companies merit scrutiny."

Last week, I.R.S. officials held their first meeting with Linda Chatman Thomsen, the director of the S.E.C.'s enforcement division. She indicated that there were tax issues in the cases that securities regulators were investigating, Mr. Ungar said.

For now, I.R.S. officials are reviewing the files of 30 to 40 of the companies that have publicly disclosed problems, including some already facing scrutiny on other tax issues. Mr. Ungar said it could take months to more than a year before these initial cases are resolved. Much of the information will need to be supplied by the companies themselves, not taken from tax returns. I.R.S. officials have not yet been in touch with the Justice Department about potential tax fraud.

0.    Novell is likely (or will be) one of these companies being investigated by the IRS.

0.    Because of Defendants' violations of law and breaches of their fiduciary duties to

Novell, the Company will need to expend significant sums of money including the following:

> costs incurred to carry out internal investigations, including legal fees paid
>
> to outside counsel, accounting firms and consultants;
>
> costs incurred from increased D&O Insurance premiums as a result of the
>
> illegally manipulated stock option grants;
>
> costs incurred from directing manpower to correct Novell's defective
>
> internal controls;
>
> incurred from directing manpower away from other projects in order to
>
> restate Novell's financial results;
>
> costs associated with the Company's unpaid taxes resulting from the
>
> backdating of stock options; and
>
> costs incurred to respond to governmental investigations.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

94.     Plaintiff brings this action derivatively in the right and for the benefit of Novell to redress injuries suffered, and to be suffered, by the Company as a direct result of Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of federal securities laws alleged herein. Novell is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

95.     Plaintiff will adequately and fairly represent the interests of Novell in enforcing and prosecuting its rights.

96.     Plaintiff is and was the owner of Novell stock during times relevant to Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

97.     The Novell Board of Directors at the time of filing of this Complaint consisted of the following eleven (11) Director Defendants: Jack L. Messman, Ronald W. Hovsepian, Albert Aiello, Jr., Fred Corrado, Richard L. Crandall, Claudine B. Malone, Richard L. Nolan, Thomas G. Plaskett, John W. Poduska, Sr., Ph.D., James D. Robinson, III, and Kathy Brittain White.

98.     Plaintiff have not made any demand upon the current Novell Board of Directors to bring an action asserting the claims herein, for the damages suffered by Novell, since such demand would be a futile, wasteful and useless act, particularly for the following reasons:

99.     During the Relevant Period, Director Defendants Messman and Hovsepian were the recipient of stock options, which Plaintiff alleges were back-dated. Because Director Defendants Messman and Hovsepian received a personal financial benefit from the challenged transactions, they are interested and demand upon them is futile.

100.    All of the Director Defendants authorized, approved, ratified or have failed to rectify some or all of the back-dated stock option grants at issue here and are named as Defendants herein.

101.    The Compensation Committee, together with the Option Grant Committee, was at all relevant times responsible for overseeing the Company's compensation, employee benefit and stock option plans. It was also responsible for supervising incentive compensation programs for the Company's employees. Director Defendants Plaskett, Poduska, and White, together with Director Defendant Messman, as members of the Compensation and Option Grant Committees, and the Novell Board by its approval of their recommendations, enabled, or through conscious abdication of duty, permitted the Company to back-date stock options issued to the Options Defendants. By such actions, Defendants breached their fiduciary duties to the Company. The back-dating of stock options was in direct violation of the stock option plans. Thus, there is reasonable doubt that Director Defendants Plaskett, Poduska, White and Messman are disinterested.

102.    The Audit Committee is responsible for assisting the Board in fulfilling its responsibilities for general oversight of the integrity of Novell's financial statements, Novell's compliance with legal and regulatory requirements, the independent auditors' qualifications and independence, the performance of Novell's internal audit function and independent auditors, and risk assessment and risk management. Director Defendants Corrado, Aiello, Crandall and Malone, as members of Novell's Audit Committee, were responsible for insuring that the Company's internal controls were adequate and that the Company's quarterly and annual financial statements were accurate. Novell's internal controls, however, were materially inadequate as evidenced by its executives' improper backdating of stock option grants. As a

31

result of this improper conduct, the Company's financials were rendered inaccurate because those financials did not account for the true amount of compensation being granted to Novell's executives. Accordingly, there is reasonable doubt that Director Defendants Corrado, Aiello, Crandall and Malone are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Novell. Thus, demand is futile as to Director Defendants Corrado, Aiello, Crandall and Malone.

103.    The back-dating of options as alleged herein was unlawful and not within Director Defendants' business judgment to acquire, authorize, ratify or facilitate.

104.    There was no basis or justification for back-dating the stock options. It was designed solely to benefit the Options Defendants in a manner that was inconsistent with the Company's public disclosures, to the detriment of the Company. Hence, the transactions constituted a waste of corporate assets, and could not have been the product of the proper exercise of business judgment by Director Defendants.

105.    During the Relevant Period, Director Defendants authorized the filing of Proxy Statements, in support of their nomination as Directors, which failed to disclose that the Options Defendants' stock options had been back-dated. They also authorized the filing of shareholder approved stock option plans, which misrepresented that the options carry the stock price of the day of the award. Any suit by the Director Defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud and proxy violations; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action.

106.    All of the Director Defendants signed one or more of the Company's Annual Reports during the Relevant Period, which contained the Company's financial statements, which

32

failed to account for the back-dated stock options as compensation and an expense of the Company. As a result, those financial statements of the Company may have overstated its profits and may need to be restated. Any suit by Director Defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action.

107.    All of the Director Defendants participated in, approved, or through abdication of duty, permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company stockholders and/or acting with negligence and gross negligence disregarded the wrongs complained of herein, and therefore are not disinterested parties.

108.    On information and belief, Director Defendants are protected against liability for breaches of fiduciary duty alleged in the Complaint by directors' and officers' liability insurance policies. As a result, if Director Defendants were to cause the Company to sue itself or certain officers of Novell, there would be no directors' and officers' insurance protection. This is yet another reason why Director Defendants are hopelessly conflicted in making any independent determination that would cause the Company to bring this action.

109.    The Board of Directors did not require that the Options Defendants immediately disgorge all of their ill-gotten gains from the improper manipulation of their stock option grants and other misconduct, did not require them to return all unexecuted stock options to the Company, and did not require them to disgorge their bonuses and equity-based compensation to the Company, despite their indisputable breaches of fiduciary duties, which worked a direct harm to the Company.

33

110.    Finally, Plaintiff have not made any demand on shareholders of Novell to institute this action since such demand would be a futile and useless act for the following reasons:

> (a)    Novell is a publicly held company with approximately 339 million shares of common stock outstanding, as well as thousands of shareholders;
>
> (b)    Making demand on such a number of shareholders would be impossible for Plaintiff who have no way of finding out the names, addresses or phone numbers of shareholders; and
>
> (c)    Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

## DERIVATIVE CLAIM FOR VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT (Against Director Defendants)

111.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112.    Director Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to shareholders which were contained in the Company's Definitive Proxies filed on February 28, 2002, March 17, 2003, February 27, 2004, February 24, 2005, February 28, 2006, which each misrepresented or failed to disclose, *inter alia,* the facts set forth above. By reasons of the conduct alleged herein, each Director Defendant violated Section 14(a) of the Exchange Act.

113.    The information would have been material to Novell's shareholders in determining whether to elect directors to manage their company.

34

114.    Plaintiff, on behalf of Novell, thereby seeks to void the election of Director
Defendants based upon the misleading and incomplete proxy materials, and to recover damages
caused by Defendants' failure to disclose the improper compensation described herein

## COUNT II

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
### (Against Director Defendants And Option Defendants)

115.    Plaintiff incorporates by reference and realleges each and every allegation set
forth above, as though fully set forth herein.

116.    Defendants all owed and owe a fiduciary duty to Novell and its stockholders. By
reason of their fiduciary relationships, Defendants all owed and owe Novell the highest
obligation of good faith, fair dealing, loyalty and due care and diligence in the management and
administration of the affairs of the Company, as well as in the financial accounting, auditing and
reporting of the Company. Moreover, Defendants owed and owe the Company and its
shareholders the duty of full and candid disclosure of all material facts thereto.

117.    Defendants violated and breached their fiduciary duties of care, loyalty, candor,
reasonable inquiry, oversight, good faith and supervision by, *inter alia*, (i) the reckless disregard
with which they published the financial statements of Novell that did not conform to GAAP; (ii)
the reckless disregard with which they supervised the audits and reviews of Novell's financial
statements and internal controls and procedures; and (iii) the violation of their duties of loyalty in
failing to detect, prevent and/or disclose Novell accounting misstatements, and the weaknesses in
the internal controls and procedures of the Company, as previously described herein.

118.    Defendants also each owed a duty to Novell to test, oversee and monitor their
systems of internal disclosure, financial and accounting controls, governance procedures and

35

disclosure procedures and to ensure that they were functioning in an effective manner and in compliance with, *inter alia,* the Sarbanes-Oxley Act of 2002.

0. Each of the Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

0. As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Novell has suffered substantial monetary damages, as well as further and even greater damage in the future, including damage to Novell's reputation and good will. Defendants are liable to the Company as a result of the misconduct alleged herein.

0. Plaintiff on behalf of Novell has no adequate remedy at law.

## COUNT III
## DERIVATIVE CLAIM FOR ABUSE OF CONTROL
### (Against Director Defendants And Option Defendants)

0. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

0. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Novell, for which they are legally responsible.

0. As a direct and proximate result of Defendants' abuse of control, Novell has suffered substantial monetary damages, as well as further and even greater damage in the future, including damage to Novell's reputation and good will. Defendants are liable to the Company as a result of the misconduct alleged herein.

0. Plaintiff on behalf of Novell has no adequate remedy at law.

36

## COUNT IV
## DERIVATIVE CLAIM FOR GROSS MISMANAGEMENT
### (Against Director Defendants And Option Defendants)

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127.    By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation, in that Defendants concealed evidence of the improper and illegal back-dating of stock options by not informing investors of the full scope of the problem but minimizing the improprieties as mere accounting issues.

128.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, Novell has suffered substantial monetary damages, as well as further and even greater damage in the future, including damage to Novell's reputation and good will.

129.    As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

130.    Plaintiff on behalf of Novell has no adequate remedy at law.

## COUNT V
## DERIVATIVE CLAIM FOR WASTE OF CORPORATE ASSETS
### (Against Director Defendants And Option Defendants)

131.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132.    By engaging in the wrongdoing alleged herein, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Defendants have caused Novell to waste valuable corporate assets by, among other things,

37

having to direct manpower to the task of restating Novell's past financials to correct for the improperly backdated stock option grants; incurring unreported compensation costs in connection with the improper employee stock option dating practices because the improper dating of the stock options brought an instant paper gain to certain Novell executives; and incurring potentially millions of dollars of legal liability and legal costs to defend Defendants' unlawful actions.

133.    As a direct and proximate result of Defendants' waste of corporate assets, Defendants are liable to the Company, Novell has suffered damages in an amount to be proven at trial.

134.    Plaintiff on behalf of Novell has no adequate remedy at law.

## COUNT VI
## DERIVATIVE CLAIM FOR UNJUST ENRICHMENT AND BREACH OF THE DUTY OF LOYALTY
### (Against Director Defendants And Option Defendants)

135.    Plaintiff incorporates by references and realleges each and every allegation set forth above, as though fully set forth herein.

136.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Novell.

137.    As a result of the back-dating of the options granted to them, the Options Defendants have been and will continue to be unjustly enriched at the expense of and to the detriment of the Company.

138.    Plaintiff, as shareholders and representatives of Novell, seek restitution, damages, an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches, and other relief for the Company, in an amount to be proven at trial. Also, this Court should order the options held by

the Options Defendants, which have not yet been exercised, to be repriced at the market price of the Company's stock on the dates the Court finds that those options were actually, in fact, granted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on her own behalf, and derivatively on behalf of Novell, prays for judgment as follows:

.       An award of monetary damages to Plaintiff, on behalf of Novell, against all Defendants and in favor of the Company for the amount of damages sustained by Novell as a result of Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

.       A declaration and decree that Defendants violated and caused the Company to act in violation of Section 14(a) of the Exchange Act;

.       Voiding the election of Director Defendants based upon the misleading and incomplete proxy materials;

.       Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff, on behalf of Novell, have an effective remedy;

.       Awarding to Novell restitution from all Defendants, and each of them and ordering disgorgement of all profits, benefits or other compensation obtained by the Defendants;

.       Awarding Plaintiff the costs and disbursements of the action, including reasonable allowance of fees for Plaintiff's attorneys, experts and accountants; and

G.     Granting Plaintiff such other and further relief as the Court deems just and proper.

DATED: September 12, 2006

**LAW OFFICES OF PETER A. LAGORIO**

By: _Peter A. Lagorio_

Peter A. Lagorio, Esq. (BBO#567379)
Steven M. Taylor, Esq. (BBO#657829)
The Prince Building
63 Atlantic Avenue
Boston, Massachusetts 02110
Telephone: (617) 367-4200
Facsimile: (617) 227-3384

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**

Lawrence P. Kolker, Esq.
Gustavo Bruckner, Esq.
Paulette S. Fox, Esq.
270 Madison Avenue
New York, New York 10016
Telephone:  (212) 545-4600
Facsimile:  (212) 545-4653

**LAW OFFICES OF JACOB T. FOGEL, P.C.**

Jacob T. Fogel, Esq.
32 Court Street – Suite # 602
Brooklyn, New York 11201

**ATTORNEYS FOR PLAINTIFF**

/450280v2

I, Sheila Simon, declare that I am a shareholder of Novell, Inc. common stock and have so owned Novell, Inc. common stock during the relevant times pertinent hereto.

I have reviewed the foregoing Verified Shareholder Derivative Complaint, and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

This Verification is made subject to the penalties of perjury under the laws of the United States.

Dated: September _3_, 2006

Sheila Simon

/448764.v3